UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

YORDAN ACOSTA-CORTINA,

     Applicant,

v.                          CASE NO. 8:22-cv-860-SDM-TGW

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

Acosta-Cortina applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 13) and challenges his conviction for second-degree felony murder, for which he is imprisoned for twenty-four years. Numerous exhibits ("Respondent's Exhibit __") support the response. (Doc. 19) The amended application asserts four grounds for relief, each of which is meritless.

## I.  **BACKGROUND**[1]

In 2004, Acosta-Cortina began dating Madelyn Gonzalez-Mederos. (Respondent's Exhibit 1a at 764) They lived in a small town in Cuba. (Respondent's Exhibit 1a at 366, 764) Acosta-Cortina was "controlling," "jealous[ ]," and physically abusive. (Respondent's Exhibit 1a at 287, 479) In September 2013, Gonzalez-Mederos and her mother moved to Tampa, Florida. (Respondent's

_____

[1] This summary of the facts derives from the trial transcript. (Respondent's Exhibit 1a)

Exhibit 1a at 371)  Acosta-Cortina followed in December 2014 and began sharing an apartment with Gonzalez-Mederos.  (Respondent's Exhibit 1a at 1175, 1177)  She agreed to the arrangement because she believed "he had changed."  (Respondent's Exhibit 1a at 461)

On November 27, 2015, Gonzalez-Mederos moved out of the apartment while Acosta-Cortina was at work.  (Respondent's Exhibit 1a at 291–92)  She had begun a romantic relationship with a co-worker, Addienys Calderon-Martinez. (Respondent's Exhibit 1a at 294)  Gonzalez-Mederos called Acosta-Cortina and told him to "leave [her] alone" because she had "left."  (Respondent's Exhibit 1a at 380) She did not mention her relationship with Calderon-Martinez.  (Respondent's Exhibit 1a at 380)

Over the next two weeks, Acosta-Cortina called Gonzalez-Mederos "over a hundred times" and sent her more than 2,000 text messages.  (Respondent's Exhibit 1a at 1280)  She did not answer the calls.  (Respondent's Exhibit 1a at 294)  She responded to "some" of the texts by telling him to "leave [her] alone." (Respondent's Exhibit 1a at 295)  In one text, Acosta-Cortina wrote, "I am not the one who destroyed me and abandoned me.  If you betrayed me, I will find out.  And if you are trying to get me to hate you, well, know that I am a bad meal." (Respondent's Exhibit 1a at 327)  Gonzalez-Mederos interpreted the text as a "threat" because "I am a bad meal" is a Cuban expression for "[y]ou know what I'm capable of doing."  (Respondent's Exhibit 1a at 327, 419)

Acosta-Cortina tried to find Gonzalez-Mederos.  He showed up unannounced at her mother's house.  (Respondent's Exhibit 1a at 772)  During this visit, she falsely claimed that Gonzalez-Mederos had moved to Miami.  (Respondent's Exhibit 1a at 773)  She thought that he would "leave her [daughter] alone" if he believed "she wasn't in Tampa."  (Respondent's Exhibit 1a at 773)  Instead, Acosta-Cortina went to Miami to look for Gonzalez-Mederos.  (Respondent's Exhibit 1a at 773–74)  When she learned of the trip, Gonzalez-Mederos felt "lots of fear."  (Respondent's Exhibit 1a at 332)

Soon after, Acosta-Cortina showed up unannounced at Gonzalez-Mederos's place of employment, a factory in Pinellas County.  (Respondent's Exhibit 1a at 299)  The factory was "closed to the public"; Acosta-Cortina entered by following someone through an employee entrance.  (Respondent's Exhibit 1a at 299, 753)  Gonzalez-Mederos was "terrified" when she saw Acosta-Cortina approach her on the factory floor.  (Respondent's Exhibit 1a at 300)  She was sitting next to Calderon-Martinez, her new boyfriend.  (Respondent's Exhibit 1a at 299)  She told Acosta-Cortina, "[W]hat are you doing here[?] . . . . [Y]ou're going to give me a problem. I'm at work."  (Respondent's Exhibit 1a at 300)  Acosta-Cortina said he would "wait outside" until her shift ended two hours later.  (Respondent's Exhibit 1a at 301)

When she got off work and realized he was "still sitting outside," Gonzalez-Mederos called 911.  (Respondent's Exhibit 1a at 301–03)  Law enforcement arrived and told Acosta-Cortina to "not come back to the property and leave her alone." (Respondent's Exhibit 1a at 729)  Later that day, Acosta-Cortina texted Gonzalez-

Mederos, "For me there are no women other than you. . . . [A]nd that skinny, ugly guy that was talking to you when I got there, who is he?" (Respondent's Exhibit 1a at 325–26, 1286)

Four days later, Acosta-Cortina returned to the factory. (Respondent's Exhibit 1a at 1304) He waited in his car until Gonzalez-Mederos got off work. (Respondent's Exhibit 1a at 1311–13) She and Calderon-Martinez left the factory together and got into his car. (Respondent's Exhibit 1a at 1313) Gonzalez-Mederos drove; Calderon-Martinez sat in the front passenger seat. (Respondent's Exhibit 1a at 340–41) Acosta-Cortina followed the pair as they left the parking lot. (Respondent's Exhibit 1a at 341, 1314) Gonzalez-Mederos pulled into a gas station, and Acosta-Cortina stopped next to her. (Respondent's Exhibit 1a at 341–42) She saw Acosta-Cortina, panicked, and decided to "[f]lee." (Respondent's Exhibit 1a at 342) He "cut[ ] in front" of her, but she eventually exited the gas station. (Respondent's Exhibit 1a at 488)

Gonzalez-Mederos drove "very fast" — approximately 100 miles per hour. (Respondent's Exhibit 1a at 343–44) Acosta-Cortina followed her within "a car's length." (Respondent's Exhibit 1a at 345) As she passed another gas station, Gonzalez-Mederos tried to lose Acosta-Cortina by making a U-turn. (Respondent's Exhibit 1a at 345) Acosta-Cortina "jumped a cement median," "turned around," and resumed chasing Gonzalez-Mederos. (Respondent's Exhibit 1a at 500) Acosta-Cortina eventually "veered over to the right" and ran Gonzalez-Mederos "off the road." (Respondent's Exhibit 1a at 521) She crashed into "a pole and a tree."

(Respondent's Exhibit 1a at 645)  Gonzalez-Mederos survived the crash; Calderon-Martinez died before paramedics arrived.  (Respondent's Exhibit 1a at 700)

Acosta-Cortina remained at the scene.  (Respondent's Exhibit 1a at 826)  He told an officer that "he was just heading southbound on 66th Street when he happened to see a car accident."  (Respondent's Exhibit 1a at 830)  The officer informed him "that there was a dash cam video to suggest that he was racing or driving at a high rate of speed with the other vehicle."  (Respondent's Exhibit 1a at 830-31)  He said, "It must have been another vehicle."  (Respondent's Exhibit 1a at 832)

Acosta-Cortina was charged with second-degree felony murder. (Respondent's Exhibit 1 at 23)  That offense requires proof that "(1) the victim is dead; (2) the defendant was not the person who actually killed the victim, but he or she did commit . . . a felony; (3) the victim's death was caused during and was the consequence of the commission . . . of the felony; and (4) the person who actually killed the victim was not involved in the commission of the felony."  *Dean v. State*, 230 So. 3d 420, 423 (Fla. 2017).  The prosecution alleged that Gonzalez-Mederos killed Calderon-Martinez "during" Acosta-Cortina's commission of aggravated stalking.  (Respondent's Exhibit 1 at 23)  Aggravated stalking occurs when a person "willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person and makes a credible threat to that person."  Fla. Stat. § 784.048(3).

One year later, the prosecution amended the charging document to replace second-degree felony murder with first-degree felony murder.  (Respondent's Exhibit

1 at 38) The difference between the two offenses lies in who killed the victim. First-degree felony murder involves a "killing . . . done by a principal . . . to the felony"; second-degree felony murder requires proof that the killer was not a principal to the felony. *State v. Williams*, 565 So. 2d 881, 882 (Fla. 1st DCA 1990). In addition to first-degree felony murder, Acosta-Cortina was charged with manslaughter by culpable negligence. (Respondent's Exhibit 1 at 38–39)

The case went to trial. The jury found Acosta-Cortina guilty of (1) the lesser-included offense of second-degree felony murder and (2) manslaughter by culpable negligence. (Respondent's Exhibit 1 at 65–66) Citing the "single homicide rule," the trial court dismissed the manslaughter conviction.[2] (Respondent's Exhibit 1 at 752) Acosta-Cortina was sentenced to twenty-four years' imprisonment for second-degree felony murder. (Respondent's Exhibit 1 at 798) The appellate court affirmed the conviction without a written opinion. (Respondent's Exhibit 7) Acosta-Cortina unsuccessfully moved for post-conviction relief under Florida Rule of Criminal Procedure 3.850. (Respondent's Exhibit 13 at 466–83; Respondent's Exhibit 16) This federal habeas application followed. (Docs. 1, 13)

## II. <u>STANDARD OF REVIEW</u>

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir.

---

[2] Under the single homicide rule, "a defendant can be charged and convicted under multiple criminal statutes for conduct causing another's death during one criminal episode, [but he] can only be punished once for that death." *Raja v. State*, 317 So. 3d 139, 147 (Fla. 4th DCA 2021).

1998).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable[;] . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *See White v. Woodall*, 572 U.S. 415, 427 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question . . . ."); *Woods v. Donald*, 575 U.S. 312, 316 (2015) ("And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citing *Woodall*, 572 U.S. at 419). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694. A federal court

must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.

In *per curiam* decisions without written opinions, the appellate court affirmed Acosta-Cortina's conviction and affirmed the denial of his Rule 3.850 motion for post-conviction relief. The appellate court's *per curiam* decisions warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). *See also Richter*, 562 U.S. at 100 ("When a federal claim has been

presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), *and Bishop v. Warden*, 726 F.3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a "decision" or "ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

Acosta-Cortina bears the burden of overcoming by clear and convincing evidence a state court's fact determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).

### III. TRIAL COURT ERROR

### Ground One:

Acosta-Cortina contends that his right to due process was violated because he was convicted of second-degree felony murder, "a crime that was not charged" in the operative indictment.  (Doc. 13 at 5)  Acosta-Cortina was originally charged with second-degree felony murder, but the prosecution later replaced that charge with first-degree felony murder.  (Respondent's Exhibit 1 at 23, 38)  During trial, the prosecution requested a jury instruction on second-degree felony murder as a lesser-included offense.  (Respondent's Exhibit 1a at 839–40)  The prosecution explained that the jury might "believe[ ] that [Calderon-Martinez] died during the course of [the] stalking but rather than [Acosta-Cortina] causing the death[,] [Gonzalez-Mederos] caused the death."  (Respondent's Exhibit 1a at 840)  The court agreed to give the instruction after Acosta-Cortina stated that he had "[n]o objection." (Respondent's Exhibit 1a at 1363)

Acosta-Cortina argues that he was convicted of "an uncharged offense" that he was not "prepared to defend [at] trial."  (Doc. 13 at 8)  The appellate court rejected this argument in an unexplained decision.  (Respondent's Exhibit 7) Consequently, Acosta-Cortina must show that the state court's decision possessed "no reasonable basis."  *Richter*, 562 U.S. at 98.  "[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."  *Hill v. Humphrey*, 662 F.3d 1335, 1346 (11th Cir. 2011).

Acosta-Cortina cannot meet his burden.  A criminal defendant is entitled to

"notice of the specific charge" against him. *Cole v. State of Arkansas*, 333 U.S. 196, 201 (1948). This principle "applies to lesser-included offenses." *Chambers v. State*, 975 So. 2d 444, 449 (Fla. 2d DCA 2007). But an alleged lack of notice does not warrant relief if (1) the defendant "did not object" at trial to the lesser-included-offense instruction and (2) the lesser-included offense "was lesser in degree and penalty than the main charge." *Ayala v. State*, 879 So. 2d 1, 3 (Fla. 2d DCA 2004); *see also Antosh v. State*, 510 So. 2d 1158, 1159 (Fla. 3d DCA 1987) (affirming conviction on lesser-included offense "because (1) the defendant did not object to a jury charge below on discharging a firearm in public as a lesser offense, and (2) the offense of discharging a firearm in public is lesser in degree and penalty than the offense charged in the information"); *Rodriguez v. Kernan*, 845 F. App'x 584, 586 (9th Cir. 2021) (deferring to "state court's decision" that petitioner "waived his right to notice of the [lesser-included offense of] false imprisonment . . . when his counsel failed to object to the jury instructions").[3]

Acosta-Cortina "did not object" at trial to the instruction on second-degree felony murder. *Ayala*, 879 So. 2d at 3. That offense is "lesser in degree and penalty than the main charge" of first-degree felony murder. *Ayala*, 879 So. 2d at 3. Specifically, second-degree felony murder is "a felony of the first degree, punishable by imprisonment for a term of years not exceeding life." Fla. Stat. § 782.04(3). First-

_____

[3] A defendant "may see a benefit in" agreeing to an instruction on a lesser-included offense, "concluding that although a jury may not be inclined to acquit him of any wrongdoing, they may be inclined to disagree that the charge is as serious as alleged by the state." *Chambers*, 975 So. 2d at 449. This "permits some chance that the defendant will receive a lesser sentence or perhaps some related future benefit by virtue of being convicted of a lesser charge." *Chambers*, 975 So. 2d at 449.

degree felony murder, by contrast, is a "capital felony" punishable either by death or by life imprisonment without the possibility of parole.  Fla. Stat. §§ 782.04(1)(a), 775.082(1)(a).  A reasonable jurist could conclude that Acosta-Cortina is entitled to no relief because he "acquiesc[ed]" in instructing the jury on second-degree felony murder, an offense "lesser in degree than the main offense."[4]  *Weber v. State*, 602 So. 2d 1316, 1318 (Fla. 5th DCA 1992).

## IV. <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Acosta-Cortina claims ineffective assistance of counsel, a difficult claim to sustain.  "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims.  According to *Strickland*,
>
>> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant

---

[4] The respondent argues that ground one is procedurally defaulted, but "a federal court may skip over the procedural default analysis if a claim would fail on the merits in any event."  *Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020).

> must show that the deficient performance
> prejudiced the defense.  This requires
> showing that counsel's errors were so serious
> as to deprive the defendant of a fair trial, a
> trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Acosta-Cortina must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.  To meet this burden, Acosta-Cortina must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Acosta-Cortina cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir.

1992).  *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. *See Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable.  *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001).  The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

**<u>Ground Two:</u>**

Acosta-Cortina faults trial counsel for "opening the door" to "prior bad acts" that had been excluded during a pre-trial hearing.  (Doc. 13 at 9)  Before trial, the

prosecution moved to admit evidence that Acosta-Cortina was "controlling," "jealous," and "violent" during his relationship with Gonzalez-Mederos. (Respondent's Exhibit 1 at 813–14)  The prosecution cited two "specific incidents" in Cuba in which Acosta-Cortina physically abused Gonzalez-Mederos.  (Respondent's Exhibit 1 at 41–43)  According to the prosecution, this evidence showed that Acosta-Cortina made "a credible threat of violence" to Gonzalez-Mederos after she broke up with him.  (Respondent's Exhibit 1 at 815)  The court allowed the prosecution to introduce evidence that Acosta-Cortina "was always controlling, always getting jealous, always getting angry."  (Respondent's Exhibit 1 at 877)  But the prosecution could not elicit testimony about "the actual incidents" of violence "unless the door [was] opened."  (Respondent's Exhibit 1 at 877)

During cross-examination of Gonzalez-Mederos, counsel asked whether Acosta-Cortina did "anything to put [her] in fear other than those texts that we've talked about and the phone call[s]."  (Respondent's Exhibit 1a at 460)  She answered, "No, sir."  (Respondent's Exhibit 1a at 460)  At the prosecution's request, the court found that this question opened the door to specific incidents of domestic violence. (Respondent's Exhibit 1a at 465–66)  On re-direct examination, Gonzalez-Mederos testified that Acosta-Cortina was "physically violent" with her.  (Respondent's Exhibit 1a at 479)  She did not provide any examples.  But her mother testified that Acosta-Cortina "smacked her [daughter's] cheek" once in Cuba.  (Respondent's Exhibit 1a at 767)

Acosta-Cortina contends that counsel provided ineffective assistance by "inadvertent[ly] . . . giving the state the opportunity to introduce prejudicial prior bad acts." (Doc. 13 at 13)  The post-conviction court held that Acosta-Cortina could not establish prejudice.  (Respondent's Exhibit 13 at 479)  According to the court, the prosecution presented "sufficient evidence of [Acosta-Cortina's] aggravated stalking and murder from November 27 [the date of the break-up] through the crash on December 12." (Respondent's Exhibit 13 at 478)  Thus, Acosta-Cortina suffered "no prejudice from the presentation of superfluous testimony about [his] behavior or actions prior to that time." (Respondent's Exhibit 13 at 478)

The court explained that Acosta-Cortina "harass[ed] [Gonzalez-Mederos] via text and phone calls, even after [she] told [him] to leave her alone." (Respondent's Exhibit 13 at 478)  He "showed up at her mother's home unannounced, went down to Miami to look for her, and showed up twice to her work unannounced." (Respondent's Exhibit 13 at 478–79)  Then he "chased [her] vehicle with his own vehicle[,] ran her off the road," and "lied to law enforcement about just happening upon the crash and not driving the other speeding vehicle." (Respondent's Exhibit 13 at 479)  According to the court, "[e]ven if the prior bad acts did not come in, the remaining evidence of [Acosta-Cortina's] texts he admitted to sending as well as his actions observed by non-interested witnesses established a credible threat to [Gonzalez-Mederos] and the death of the victim." (Respondent's Exhibit 13 at 479)  Therefore, "had counsel [kept out] the prior bad acts, the outcome of the trial would have been the same." (Respondent's Exhibit 13 at 479)

This ruling was reasonable. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [the district court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Acosta-Cortina] — that there was no substantial likelihood of a different result — was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Acosta-Cortina cannot meet this demanding standard. To prove felony murder, the prosecution needed to establish that Acosta-Cortina committed aggravated stalking. Fla. Stat. §§ 782.04(1)(a)2, 782.04(3). Aggravated stalking occurs when a person "willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person and makes a credible threat to that person." Fla. Stat. § 784.048(3). A "credible threat" means "a verbal or nonverbal threat, . . . including threats delivered by electronic communication or implied by a pattern of conduct, which places the person who is the target of the threat in reasonable fear for his or

her safety . . . , and which is made with the apparent ability to carry out the threat to cause such harm."  Fla. Stat. § 784.048(1)(c).

According to the prosecution, Acosta-Cortina's physical abuse of Gonzalez-Mederos showed that he made "a credible threat of violence" after she ended the relationship.  (Respondent's Exhibit 1 at 815)  But even without the limited testimony about physical abuse, substantial evidence established that Acosta-Cortina committed aggravated stalking.  After the break-up, he called Gonzalez-Mederos "over a hundred times" and sent her more than 2,000 text messages.  (Respondent's Exhibit 1a at 1280)  She did not answer the calls, though she responded to "some" of the texts by telling him to "leave [her] alone."  (Respondent's Exhibit 1a at 294–95)  In one text, Acosta-Cortina wrote, "If you betrayed me, I will find out.  And if you are trying to get me to hate you, well, know that I am a bad meal."  (Respondent's Exhibit 1a at 327)  Gonzalez-Mederos interpreted the text as a "threat" because "I am a bad meal" is a Cuban phrase that means "[y]ou know what I'm capable of doing."  (Respondent's Exhibit 1a at 327, 419)  Moreover, Acosta-Cortina "showed up at her mother's home unannounced, went down to Miami to look for her, and showed up twice to her work unannounced."  (Respondent's Exhibit 13 at 478–79)  When these efforts failed, he "chased [her] vehicle with his own vehicle and ran her off the road."  (Respondent's Exhibit 13 at 479)

Even apart from the limited evidence of physical abuse, Acosta-Cortina's words and conduct after the break-up established that he "willfully, maliciously, and repeatedly follow[ed], harasse[d], or cyberstalk[ed] [Gonzalez-Mederos] and ma[de]

a credible threat to [her]." Fla. Stat. § 784.048(3). Given the strength of the prosecution's case, a reasonable jurist could find that Acosta-Cortina suffered no prejudice from the evidence of physical abuse presented at trial. *See Strickland*, 466 U.S. at 695–96 ("In making [the prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) ("The overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show *Strickland* prejudice").

**<u>Ground Three:</u>**

Acosta-Cortina contends that trial counsel provided ineffective assistance by failing to investigate and call four witnesses: Diego Jimenez, Iosvani Mendez, Frank Oviedo, and Erisbel Blanco-Hernandez. (Doc. 13 at 14) The witnesses were friends of Acosta-Cortina. (Doc. 13 at 15–20) They allegedly would have testified that Acosta-Cortina and Gonzalez-Mederos were "very loving and respectful of [each other]," that Gonzalez-Mederos "always seemed very happy," and that "there was no indication of any violent, jealous, or controlling behavior [by Acosta-Cortina]." (Doc. 13 at 15, 18–19) Acosta-Cortina argues that this testimony would have created "a reasonable probability that the jury would have disregarded the testimony of [Gonzalez-Mederos]." (Doc. 13 at 20)

The post-conviction court held that Acosta-Cortina suffered "no prejudice from the absence of the . . . potential defense witnesses who would have testified that [he] was a good guy before [the break-up]." (Respondent's Exhibit 13 at 481) According to the court, evidence that Acosta-Cortina "was jealous or controlling or instilled fear in [Gonzalez-Mederos before the break-up]" was "not necessary to find that [he] harassed and instilled fear in [her] after [the relationship ended]." (Respondent's Exhibit 13 at 481) The court explained that "[t]he evidence presented [about Acosta-Cortina's behavior after the break-up] established the elements of the offense." (Respondent's Exhibit 13 at 482) Therefore, "[e]ven if counsel [had] called character witnesses on [Acosta-Cortina's] behalf, the remaining evidence of [the] texts he admitted to sending as well as his actions observed by non-interested witnesses established a credible threat to [Gonzalez-Mederos] and the death of the victim." (Respondent's Exhibit 13 at 482)

The rejection of this claim was reasonable. Acosta-Cortina cannot show that the post-conviction court's finding of no prejudice "was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin*, 89 F.4th at 1317. As explained above, Acosta-Cortina's words and conduct after the break-up were independently sufficient to prove aggravated stalking, the predicate offense for second-degree felony murder. Thus, a fairminded jurist could find no "reasonable probability that, but for counsel's [failure to call the potential witnesses], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261.

Moreover, the burden of establishing prejudice under *Strickland* "is particularly heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative." *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021). For that reason, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." *McKiver*, 991 F.3d at 1365. Acosta-Cortina presents no evidence — through affidavits or otherwise — that his proposed witnesses would have testified in the manner he suggests. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective-assistance claim."). "Without such a showing, [Acosta-Cortina] cannot demonstrate *Strickland* prejudice." *Afshar v. Sec'y, Dep't of Corr.*, No. 2:24-cv-826-JES-NPM, 2025 WL 404629, at *5 (M.D. Fla. Feb. 5, 2025) (finding no prejudice from failure to call witness because petitioner did not "offer[ ] [the witness's] sworn testimony detailing what he would have said if deposed or called to testify at trial"); *see also Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("[Petitioner] offers only speculation that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner.").

**Ground Four:**

Acosta-Cortina faults trial counsel for not objecting when the prosecution requested a jury instruction on second-degree felony murder as a lesser-included offense. (Doc. 13 at 21) The operative indictment charged Acosta-Cortina with first-degree felony murder. (Respondent's Exhibit 1 at 38) According to Acosta-Cortina, however, the indictment failed to allege "all the elements" of second-degree felony murder. (Doc. 13 at 24) Thus, counsel allegedly should have argued that second-degree felony murder could not be "submi[tted] to the jury for consideration" as a lesser-included offense. (Doc. 13 at 25)

The post-conviction court rejected this claim. Citing Florida law, the court explained that a jury may be instructed on "a permissive lesser-included offense [such as second-degree felony murder] only where (1) the charging document alleges all of the statutory elements of the lesser offense and (2) some evidence presented at trial establishes each of those elements." (Respondent's Exhibit 13 at 468) The court held that counsel was not deficient because "the charging document allege[d] the statutory elements of second-degree felony murder and there was some evidence presented at trial establishing each element" of the offense. (Respondent's Exhibit 13 at 469)

The indictment alleged that Acosta-Cortina, "while engaged in the perpetration of . . . aggravated stalking that occurred on or between November 27, 2015, and December 12, 2015, did chase [ ] Gonzalez-Mederos with a motor vehicle, and as a consequence thereof, [ ] Calderon-Martinez died." (Respondent's Exhibit 1

at 38)  As the post-conviction court explained, second-degree felony murder has

"four elements":  "(1) the victim is dead; (2) the defendant was not the person who

actually killed the victim, but the defendant did commit a felony; (3) the victim's

death was caused during and was a consequence of the commission of the felony;

and (4) the person who actually killed the victim was not involved in the commission

of the felony."  (Respondent's Exhibit 13 at 468)  The court found that the

indictment alleged "all of the statutory elements of the lesser offense of second-

degree felony murder" — that "the victim [was] dead, that [Acosta-Cortina] did

commit a felony, and that the victim's death was caused during and was a

consequence of the commission of the felony."  (Respondent's Exhibit 13 at 468)

The court acknowledged that the indictment did "not specify whether the victim was

murdered by the person who committed the felony ([Acosta-Cortina]) or by a non-

principal ([Gonzalez-Mederos])."  (Respondent's Exhibit 13 at 468–69)  The court

found, however, that "either [was] possible by the language of the indictment."

(Respondent's Exhibit 13 at 469)

Also, the court concluded that "some evidence at trial establish[ed] each of the

elements of second-degree felony murder."  (Respondent's Exhibit 13 at 469)

Gonzalez-Mederos's testimony "established the felony of aggravated stalking,"

"[t]he defense stipulated that the victim died," and the victim's "death was caused

during and was a consequence of [Acosta-Cortina's] high-speed car chase (*i.e.*, [his]

aggravated stalking)."  (Respondent's Exhibit 13 at 469)  Moreover, Gonzalez-

Mederos, "who was driving the vehicle that crashed . . . , was not involved in the

commission of the aggravated stalking." (Respondent's Exhibit 13 at 469)  Thus,
because any objection to the instruction would have failed, "counsel was not
deficient for acquiescing to the jury being instructed on second-degree felony
murder." (Respondent's Exhibit 13 at 469)

This ruling was reasonable.  "[A]lthough the issue of ineffective assistance . . .
is one of constitutional dimension," a court "must defer to the state's construction of
its own law when the validity of the [ineffective assistance] claim . . . turns on state
law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017).  The post-
conviction court found that, as a matter of Florida law, any objection would have
failed because the jury was properly instructed on second-degree felony murder as a
lesser-included offense.  (Respondent's Exhibit 13 at 468–69)  Therefore, the post-
conviction court "already has told us how the issue[ ] would have been resolved
under Florida state law had [counsel] done what [Acosta-Cortina] argues he should
have done." *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005).

Because the post-conviction court "authoritatively decided as a matter of
[Florida] law" that any objection to the instruction would have failed, the remainder
of the analysis is straightforward.  *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th
1338, 1351 (11th Cir. 2024).  "A lawyer cannot be deficient for failing to raise a
meritless claim." *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008).  As a
result, the post-conviction court reasonably concluded that counsel was not deficient
for failing to raise a meritless objection to the instruction.  *See Tatara v. Sec'y, Dep't of
Corr.*, 849 F. App'x 858, 862–63 (11th Cir. 2021) (deferring to state-court ruling that

"second-degree murder" was properly classified as "a permissive lesser-included offense of first-degree murder"); *Robinson v. Sec'y, Dep't of Corr.*, No. 20-10846-D, 2021 WL 831983, at *7 (11th Cir. Jan. 20, 2021) (deferring to state-court determination that "any objection to reclassification based on an allegedly defective information, the state's failure to give pre-trial notice, and the trial evidence would have been meritless under Florida law"); *Holt v. Sec'y, Dep't of Corr.*, No. 8:19-cv-2730-SDM-TGW, 2023 WL 2044771, at *23 (M.D. Fla. Feb. 16, 2023) ("Whether the indictment alleged sufficient facts to charge a crime is an issue of state law, and a state court's determination of state law receives deference in federal court.").

## V. <u>CONCLUSION</u>

Acosta-Cortina's amended application for the writ of habeas corpus (Doc. 13) is **DENIED**.  The respondent's request to dismiss the Attorney General from this action (Doc. 18 at 2) is **GRANTED**.[5]  The clerk must enter a judgment against Acosta-Cortina and **CLOSE** this case.

**CERTIFICATE OF APPEALABILITY
AND LEAVE TO APPEAL *IN FORMA PAUPERIS***

Because Acosta-Cortina fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate both the merits of the grounds and the procedural issues, a certificate of appealability and

---

[5] When prisoners challenge their physical confinement, "the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004).  Because the proper respondent is the Secretary of the Florida Department of Corrections, the Florida Attorney General is dismissed from this case.

leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Acosta-Cortina must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on May 13, 2025.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE